**In the Interest of E.R., J.B., E.G., and C.L., Children.**

No. 11–0282.

Supreme Court of Texas.

Argued Feb. 28, 2012.

Decided July 6, 2012.

Concurring Opinion Aug. 31, 2012.

Jeremy C. Martin, Malouf & Nockels LLP, Georganna L. Simpson, Georganna L. Simpson, P.C., Dallas, TX, for E.R.

Craig M. Watkins, Dallas County District Attorney, Michael R. Casillas, Kimberly Joy Duncan, Dallas County District Attorney's Office, Michael Chad Kotwal, Henry Wade Juvenile Justice Center, Dallas, TX, for State of Texas.

Jonathan F. Mitchell, Solicitor General, Office of the Attorney General, Arthur Cleveland D'Andrea, Assistant Solicitor General, for Amicus Curiae Solicitor General of Texas.

Chief Justice JEFFERSON delivered the opinion of the Court.

When the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures.[1] The most basic of these is notice. If the State cannot deliver notice in person, it may try other means that will likely reach the parent.[2] We consider today whether serving the parent in a newspaper advertisement, "a

---

1. *Santosky v. Kramer,* 455 U.S. 745, 747–48, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).

2. *McDonald v. Mabee,* 243 U.S. 90, 91–92, 37 S.Ct. 343, 61 L.Ed. 608 (1917).

poor and sometimes a hopeless substitute for actual service," [3] is constitutionally acceptable when the State knew the mother's identity, was in regular contact with her, and had at least one in-person meeting with her after it sued to terminate the legal rights to her children. We conclude that the substituted service was poor, hopeless, and unjustifiable under these circumstances.

But that does not end our inquiry. A parental rights termination proceeding encumbers a value "far more precious than any property right" [4] and is consequently governed by special rules.[5] We are faced not with the ordinary dispute about how to allocate money in a contract or tort action. We must decide how to reconcile a parent's desire to raise her child with the State's responsibility to promote the child's best interest. The Legislature and our courts have labored to ensure that proceedings to terminate a parent's legal relationship to her child are handled efficiently. To promote permanency in child rearing at the earliest stage possible, the Legislature has enacted a strict six-month deadline to challenge a termination judgment following citation by publication.[6] For reasons we explain below, that strict time limit cannot foreclose a challenge when the parent has no constitutionally adequate notice of the proceeding. On the other hand, because a parent must remain vigilant with respect to her child's welfare, and because courts must always consider the child's best interest, a parent who learns about a judgment terminating the bonds to her child must act diligently to restore that right.

We reverse the court of appeals' judgment affirming the termination of parental rights. We remand the case to the trial court to determine whether the mother unreasonably failed to act after knowing that a final judgment had taken away her children, and if so, whether granting relief would impair another person's substantial interest in reliance on that judgment.

## I. Background

Several months after removing L.R.'s four children from her home and becoming their temporary managing conservator, the Department of Family Protective Services petitioned the trial court to terminate L.R.'s parental rights. After an unsuccessful attempt at personal service, the Department decided to serve L.R. by publication. Felicia Chidozie, the caseworker, prepared an affidavit summarizing her attempts to locate L.R. Although she had L.R.'s phone number, Chidozie said that L.R. told her that she was in the process of moving and did not have a permanent address. Chidozie ran a background check through IMPACT, which confirmed the address Chidozie already possessed. Chidozie also checked a website, www.anywho.com, and found no listing. Chidozie's call to the Texas Vine System was fruitless, and the Salvation Army refused on confidentiality grounds to answer her

---

**3.** *City of New York v. N.Y., New Haven & Hartford R.R. Co.*, 344 U.S. 293, 296, 73 S.Ct. 299, 97 L.Ed. 333 (1953).

**4.** *Santosky*, 455 U.S. at 758, 102 S.Ct. 1388.

**5.** *See, e.g., id.* at 747–48, 102 S.Ct. 1388 (requiring a higher level of proof in termination proceedings than that required to "award money damages in an ordinary civil action" and holding that only a clear-and-convincing

evidence standard adequately protected parent's due process rights).

**6.** *See* Tex. Fam.Code § 161.211(b) ("Notwithstanding Rule 329, Texas Rules of Civil Procedure, the validity of an order terminating the parental rights of a person who is served by citation by publication is not subject to collateral or direct attack after the sixth month after the date the order was signed.").

query. Chidozie faxed TXU Electric, Missing Person's Clearinghouse, Voter Registration, and Adult Probation, but received no responses in the two days between sending the faxes and filing her affidavit stating that L.R. could not be located. Finally, Chidozie called the "motor vehicle Tax Roles" but was told that it could locate information only from property or motor vehicle numbers. Based on this affidavit, the trial court authorized service by publication.

The Department published the citation,[7] and the trial court conducted a final hearing. L.R. *did not appear.* The hearing transcript spans twelve double-spaced pages. Two witnesses testified: Chidozie and Erica Finley, the children's guardian and "aunt."[8] Chidozie testified that she searched diligently for L.R. and signed an affidavit chronicling her efforts. She stated that L.R. had visited the children at the Department's offices a month before the termination hearing.[9] Chidozie said that L.R. gave her a phone number but would not provide an address. Chidozie contacted L.R. at that phone number and gave her information about court hearings. Chidozie testified that L.R. attended the hearings, but was tardy each time. Chidozie said L.R. had knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being. According to Chidozie, the children

were physically abused, and L.R. tested positive for methamphetamine when she gave birth to her youngest child. Chidozie testified that the children were doing well in Finley's home and that termination would be in their best interest. She stated that the Department's plan was to be named the permanent managing conservator and for the children to be adopted.

Finley testified that the children had been living with her for approximately six months, that they were happy, and that she planned to adopt them. Joe Rosenfield, the children's guardian ad litem, stated that Finley wanted the children, and they were doing well under her care. He opined that termination would be in the children's best interest.

Brenda Hull Thompson, who appeared as "publication attorney,"[10] stated that L.R. was served by publication and that publication was "ripe" on October 15, 2007. Thompson apparently never met with L.R. and learned for the first time at the hearing that L.R. had personally visited the children at the Department's offices. Thompson made no other statements about L.R., nor did she opine that termination would be in the children's best interest. The trial court terminated L.R.'s parental rights as well as those of the putative fathers, and it appointed the Department permanent managing conservator.

7. The record does not contain a copy of the citation nor any information about where it was published. In contrast to our procedural rules, the Family Code requires only a single publication. *Compare* TEX. FAM.CODE § 102.010(b) ("Citation by publication shall be published one time."), *with* TEX.R. CIV. P. 116 ("The citation ... shall be served ... by having the same published once each week for four (4) consecutive weeks....").

8. In a post-judgment motion, the maternal grandmother disputed that Finley is related to the children.

9. The petition for termination was filed May 25, 2007. Chidozie's affidavit of citation by publication was filed August 24. L.R. met with Chidozie at the Department's offices in either August or September (Chidozie's testimony conflicts on this point), and the termination hearing occurred on October 25.

10. *See* TEX. FAM.CODE § 107.013(a)(2).

L.R. moved for a new trial within two years of the judgment. *See* Tex.R. Civ. P. 329(a) (authorizing trial court to grant motion for new trial filed within two years of judgment, if judgment rendered on service by publication and defendant did not appear in person or by attorney of her own selection). She complained that service by publication was obtained by fraud and was invalid because, among other things, she had been in regular, personal contact with Chidozie and visited the children at the Department offices during the time the Department was attempting to serve her. L.R. denied ever telling Chidozie that she did not have an address at which she could be served; instead, she asserted that she told Chidozie she did not have an address separate from her mother's, which Chidozie already had. L.R. also challenged Chidozie's affidavit.

The Department argued that L.R.'s motion was untimely because it was filed beyond Rule 329's two-year deadline.[11] Chidozie disputed L.R.'s characterization of their conversation about her address, but Chidozie admitted that she met with L.R. in the Department's offices for a prescheduled meeting in August 2007. The Department did not cite the Family Code's six-month deadline for attacking termination decrees.[12] The trial court denied the motion, and L.R. appealed.

In her appellate brief, L.R. included a footnote citing Family Code section 161.211 but argued that the matter was an affirmative defense that the Department waived by failing to raise it in the trial court, citing *In re Bullock*, 146 S.W.3d 783, 790–91 (Tex.App.—Beaumont 2004, no pet.). The Department's brief cited the

same case and agreed that "[t]he six-month limitation in section 161.211 is an affirmative defense, which is waived if not presented to the trial court.... If the State's argument regarding the timeliness of the motion was not sufficient to invoke the six-month limitation in section 161.211, appellant's November 16, 2009 motion for new trial was timely under rule 329(a)...."

Three months after briefing had been completed, the Department filed an amended brief, now arguing that section 161.211 absolutely barred challenges made more than six months after the order was signed, and that the court of appeals should not reach the merits because L.R.'s motion was untimely.

A divided court of appeals agreed. 335 S.W.3d 816. The court held that section 161.211's six-month deadline was dispositive: "The mandatory language of family code section 161.211 leaves no room for a construction other than a requirement that any collateral or direct attack on the termination of parental rights, including a motion for new trial, be filed no more than six months after the termination order is signed." *Id.* at 820. Because L.R.'s challenge was not filed within that period, it was barred. The court of appeals held that L.R. had not raised a constitutional challenge and thus had not preserved or presented the issue for review. *Id.* at 823.

The dissent concluded that the six-month deadline applied only to people who were *validly* served by publication. *Id.* at 827 (Murphy, J., dissenting). Because service on L.R. was invalid, the deadline was inapplicable:

---

**11.** The motion was filed November 16, 2009. Because the judgment's two-year anniversary date, November 14, 2009, was a Saturday, the motion was filed within Rule 329(a)'s deadline. *See* Tex.R. Civ. P. 4, 329(a).

**12.** *See* Tex. Fam.Code § 161.211(b).

While I agree that this State's policy is to provide stability and finality for children, *see* Tex. Fam.Code Ann. § 153.001(a)(2), the legislature's intent could not be—especially when no clear language suggests—effectively to create a presumption under subsection 161.211(b) that it is always in the best interest of the child to terminate parental rights after the expiration of six months regardless of whether the trial court ever acquired jurisdiction over the parent. Given the plain and specific language of subsection 161.211(b), the presumption the legislature intended the statute to comply with the Texas and United States Constitutions, and our obligation to construe statutes to avoid constitutional infirmities, I would conclude it was the intent of the legislature in enacting subsection 161.211(b) to bar attacks on parental termination orders only in situations where the parent was actually "served."

*Id.* at 829. The dissent determined that L.R. was never validly served by publication because the Department had L.R.'s working phone number and a contact address, the caseworker met with L.R. during the time service by publication was being pursued, the Department knew the whereabouts of at least one relative, and Chidozie's affidavit was inconsistent with her live testimony. *Id.* at 832.

We granted L.R.'s petition for review.[13] 55 Tex.Sup.Ct.J. 145 (Dec. 16, 2011).

## II. Citation by Publication

### A. History

■ Citation by publication is a form of substituted service that, through a small notice published in the classified section of a local newspaper, is meant to apprise a defendant that her rights are at stake. Courts have accepted this method for more than a century. *See, e.g., Pennoyer v. Neff,* 95 U.S. 714, 727, 24 L.Ed. 565 (1877); *Harris v. Daugherty,* 74 Tex. 1, 11 S.W. 921, 922 (1889). Sixty years ago, however, the Supreme Court squarely addressed the practice's due process implications. *See Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950). *Mullane* remains the seminal case involving notice by publication, and it explains how to evaluate the adequacy of notice. *See* 4A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1074, at 368 (3d ed.2002) (noting that *Mullane* "is recognized as the keystone of the modern philosophy regarding the due process aspects of a notice requirement and the importance of the case should not be underestimated"). We measure the constitutionality of notice using *Mullane*'s analytical framework, rather than *Mathews v. Eldridge*'s balancing test.[14] *Dusenbery v. United States,* 534 U.S. 161, 167–68, 122 S.Ct. 694, 151 L.Ed.2d 597 (2002).

*Mullane* involved a common trust fund, a mechanism for pooling small trusts to

---

**13.** We called for the views of the Solicitor General, who submitted a brief on behalf of the State of Texas as amicus curiae.

**14.** *See Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). In that case, the Supreme Court held that:

[I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335, 96 S.Ct. 893.

simplify their administration. *Mullane*, 339 U.S. at 307–08, 70 S.Ct. 652. Under New York law, once such a fund had been established, its beneficiaries could be served by publication for four successive weeks. *Id.* at 309–10, 70 S.Ct. 652. Central Hanover established a common trust fund and petitioned the court for settlement of its first account as common trustee. *Id.* at 309, 70 S.Ct. 652. Central Hanover provided publication notice to beneficiaries. *Id.* A court-appointed attorney retained to represent the beneficiaries complained that notice by publication was constitutionally inadequate. *Id.* at 311, 70 S.Ct. 652.

The Supreme Court agreed. The Court observed that "[m]any controversies have raged about the cryptic and abstract words of the Due Process Clause but there can be no doubt that at a minimum they require that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Id.* at 313, 70 S.Ct. 652. The Court noted that personal service was the classic form of notice "always adequate in any type of proceeding." *Id.* at 313–14, 70 S.Ct. 652. But personal service is not always necessary, and "[a] construction of the Due Process Clause which would place impossible or impractical obstacles in the way could not be justified." *Id.* But "when notice is a person's due, process which is a mere gesture is not due process." *Id.* at 315, 70 S.Ct. 652. The Court then outlined some of the problems with publication notice:

> It would be idle to pretend that publication alone ... is a reliable means of acquainting interested parties of the fact that their rights are before the courts. It is not an accident that the greater number of cases reaching this Court on the question of adequacy of notice have been concerned with actions founded on process constructively served through local newspapers. Chance alone brings to the attention of even a local resident an advertisement in small type inserted in the back pages of a newspaper, and if he makes his home outside the area of the newspaper's normal circulation the odds that the information will never reach him are large indeed ... In weighing its sufficiency on the basis of equivalence with actual notice, we are unable to regard this as more than a feint.

*Id.* For missing or unknown persons, service by this "indirect and even ... probably futile" means did not raise due process concerns. *Id.* at 317, 70 S.Ct. 652. But as to a known beneficiary with a known address, the Court concluded, notice by publication was constitutionally defective because it was not "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.* at 314, 319, 70 S.Ct. 652.

The Court revisited *Mullane* thirty-three years later in *Mennonite Board of Missions v. Adams*, 462 U.S. 791, 103 S.Ct. 2706, 77 L.Ed.2d 180 (1983). There, a landowner signed a mortgage in favor of the Mennonite Board of Missions. *Mennonite*, 462 U.S. at 792, 103 S.Ct. 2706. After the landowner failed to pay property taxes, the county began proceedings to sell the property. *Id.* at 794, 103 S.Ct. 2706. Indiana law required that notice be posted at the county courthouse and published for three consecutive weeks. *Id.* at 793, 103 S.Ct. 2706. Afterwards, the county could sell the property to the highest bidder. *Id.* After the auction, a two-year redemption period commenced during which those with an interest in the property could pay the delinquency. *Id.* Failing that, the purchaser acquired the deed. *Id.* at 794, 103 S.Ct. 2706.

The county published notice and auctioned the property. *Id.* Adams, as the high bidder, sued to quiet title to the property. *Id.* at 794–95, 103 S.Ct. 2706. Mennonite did not learn of the tax sale until after the redemption period had expired. *Id.* at 794, 103 S.Ct. 2706. Mennonite argued that publication notice of the tax sale was constitutionally inadequate. *Id.* at 795, 103 S.Ct. 2706. The Indiana courts rejected this argument, but the Supreme Court held that "unless the mortgagee is not reasonably identifiable, constructive notice [by publication] alone does not satisfy the mandate of *Mullane*." *Id.* at 798, 103 S.Ct. 2706. The Court observed that Mennonite's identity was known, and it assumed that Mennonite's address could have been ascertained by reasonably diligent efforts. *Id.* at 798 n. 4, 103 S.Ct. 2706. The Court held that "[n]otice by mail or other means as certain to ensure actual notice is a minimum constitutional precondition to a proceeding which will adversely affect the liberty or property interests of *any* party, whether unlettered or well versed in commercial practice, if its name

and address are reasonably ascertainable." *Id.* at 800, 103 S.Ct. 2706. The Court reversed the Indiana Court of Appeals' judgment and held that publication notice failed to provide Mennonite with due process.

In a similar vein, the Supreme Court has rejected publication notice to known creditors or those whose identities are "reasonably ascertainable" [15] and to known landowners in condemnation proceedings.[16] The Court has also held that tenants were denied due process when served only by posted notice in an eviction proceeding,[17] and that class members whose names and addresses could be ascertained through reasonable effort cannot be served by publication.[18]

■ From these decisions, we can distill a common principle: when a defendant's identity is known, service by publication is generally inadequate. *See, e.g.,* 1 RESTATEMENT (SECOND) OF JUDGMENTS § 2, reporter's note cmt. a (1982) ("Some courts still do not seem to have appreciated the thrust

15. *Tulsa Prof'l Collection Servs., Inc. v. Pope,* 485 U.S. 478, 491, 108 S.Ct. 1340, 99 L.Ed.2d 565 (1988); *see also City of New York v. N.Y., New Haven & Hartford R.R. Co.,* 344 U.S. 293, 296–97, 73 S.Ct. 299, 97 L.Ed. 333 (1953) (holding that publication notice deprived New York City, a known creditor, of due process).

16. *See, e.g., Schroeder v. New York,* 371 U.S. 208, 211, 83 S.Ct. 279, 9 L.Ed.2d 255 (1962) (holding that landowner whose name and address were on the deed records and tax rolls was entitled to more than service by publication; publication notice "did not measure up to the quality of notice" demanded by the Due Process Clause); *Walker v. City of Hutchinson,* 352 U.S. 112, 77 S.Ct. 200, 1 L.Ed.2d 178 (1956) (holding that publication notice deprived landowner of due process in condemnation proceeding, where landowner's "name was known to the city and was on the official records"; "there seem to be no compelling or even persuasive reasons why such direct notice cannot be given").

17. *See Greene v. Lindsey,* 456 U.S. 444, 456, 102 S.Ct. 1874, 72 L.Ed.2d 249 (1982) (holding that tenants were denied due process when served only by posting, regardless of the fact that tenants did not file their challenge until after default judgments had been entered against them and their time for appeal had lapsed; "in failing to afford appellees adequate notice of the proceedings against them before issuing final orders of eviction, the State has deprived them of property without the due process of law required by the Fourteenth Amendment")

18. *See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 176–77, 94 S.Ct. 2140, 40 L.Ed.2d 732 (holding that federal procedural rule 23(c)(2) requires individual notice to all class members whose names and addresses can be ascertained through reasonable effort; trial court erred in authorizing notice by publication).

of *Mullane....* The critical distinction is between notice to known claimants and notice to persons unknown. Notice by publication meets the requirement of adequate notice as to the latter but not as to the former.").

 Notice by publication, constitutionally suspect in 1950, is even more vulnerable today, given the precipitous decline in newspaper readership. *See* Jennifer Lee Case, Note, *Extra! Read All About It: Why Notice by Newspaper Publication Fails to Meet* Mullane's *Desire-to-Inform Standard and How Modern Technology Provides a Viable Alternative*, 45 GA. L.REV. 1095, 1097 (2011) (observing that, when *Mullane* was decided, over 80% of American adults read a weekday newspaper; today that number is 50%). One thing is clear: service by publication should be a last resort, not an expedient replacement for personal service.[19] Because "[n]otice by publication is a poor and sometimes a hopeless substitute for actual service of notice[,] ... [i]ts justification is difficult at best." *City of New York v. N.Y., New Haven & Hartford R.R. Co.*, 344 U.S. 293, 296, 73 S.Ct. 299, 97 L.Ed. 333 (1953); *see also Walker v. City of Hutchinson*, 352 U.S. 112, 117, 77 S.Ct. 200, 1 L.Ed.2d 178 (1956) ("In too many instances notice by publication is no notice at all.").

**B. A State law time limit is unenforceable when it violates due process.**

*Mullane*'s due process requirements displace state statutes that restrict the time for challenging a judgment. In *Tulsa Professional Collection Services, Inc. v. Pope*, 485 U.S. 478, 108 S.Ct. 1340, 99 L.Ed.2d 565 (1988), the Supreme Court examined whether notice by publication deprived a creditor of due process. H. Everett Pope, Jr., was hospitalized at St. John Medical Center, where he later died. *Tulsa Prof'l*, 485 U.S. at 482, 108 S.Ct. 1340. His wife initiated probate proceedings and, pursuant to Oklahoma law, published notice to creditors. *Id.* At that time, Oklahoma's nonclaim statute[20] required creditors to file claims against an estate within two months, otherwise their claims would be "barred forever." *Id.* at 481, 108 S.Ct. 1340. The statute required only service by publication. *Id.* Tulsa Professional Collection Services, the hospital's assignee, filed its claim after the two-month deadline. *Id.* at 482, 108 S.Ct. 1340. The trial court denied the claim, the Oklahoma Court of Appeals affirmed, rejecting Tulsa's argument that notice by publica-

---

19. *See* 2 WILLIAM V. DORSANEO III, TEXAS LITIGATION GUIDE § 32.105[1][b] (2012) ("Cautious practitioners should exhaust all other possible means of service before using citation by publication," because "[d]ue process considerations may render service by publication ineffective unless all of the available methods reasonably likely to result in actual notice to the defendant have been attempted...."); 4A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1074, at 364 (3d ed.2002) ("Publication ordinarily is not a proper means of service in actions based on in personam jurisdiction. Perhaps the only general context in which service by publication will be sufficient is when it is used to serve an absent domiciliary who cannot be served in any other way.").

20. Such nonclaim statutes are almost universally included in state probate codes, and the Uniform Probate Code contains a similar provision barring claims filed more than four months after notice. *See* UNIF. PROBATE CODE § 3–801 (requiring creditors to "present their claims within four months after the date of the first publication of the notice or be forever barred") (amended 1989), 8 U.L.A. 208 (1998); *Tulsa Prof'l*, 485 U.S. at 479, 108 S.Ct. 1340; *see also* TEX. PROB.CODE § 294(d) (providing that unsecured creditors' claims will be barred if they fail to file a claim within four months of receiving notice by certified mail).

tion violated due process, and the Oklahoma Supreme Court agreed. *In re Estate of Pope*, 733 P.2d 396, 398 (Okla.1986).

The U.S. Supreme Court reversed. *Tulsa Prof'l*, 485 U.S. at 491, 108 S.Ct. 1340. The Court noted that the State had a legitimate interest in resolving probate proceedings expediently, and it observed that "the almost uniform practice is to establish such short deadlines, and to provide only publication notice." *Id.* at 489, 108 S.Ct. 1340. Nonetheless, the Court held that service by publication was unconstitutional as to known creditors or those whose identities were "reasonably ascertainable," concluding that another form of service that would provide "actual notice to [such] creditors is not so cumbersome as to unduly hinder the dispatch with which probate proceedings are conducted." *Id.* at 490, 108 S.Ct. 1340. The Court remanded for the trial court to determine whether Tulsa's identity as a creditor was known or reasonably ascertainable. If it was, "then termination of appellant's claim without actual notice violated due process," regardless of the statutory two-month deadline for filing claims. *Id.; see also Greene v. Lindsey*, 456 U.S. 444, 456, 102 S.Ct. 1874, 72 L.Ed.2d 249 (1982) (holding that tenants were denied due process when served only by posting, regardless of the fact that tenants did not file their challenge until after default judgments had been entered against them and their time for appeal had lapsed); *Schroeder v. New York*, 371 U.S. 208, 211, 83 S.Ct. 279, 9 L.Ed.2d 255 (1962) (holding that publication notice "did not measure up to the quality of notice" demanded by the Due Process Clause even though challenge not filed within statutory three year limitations period); *Walker v. City of Hutchinson*, 352 U.S. 112, 116, 77 S.Ct. 200, 1 L.Ed.2d 178 (1956) (holding that publication notice deprived landowner of due process even though collateral attack filed after deadline for appeal had passed).

■ Most state courts that have considered the issue have reached a similar conclusion: due process prevails over a state law time limit, even one imposed on challenges to termination of parental rights or adoptions.[21]

**21.** See *McKinney v. Ivey*, 287 Ark. 300, 698 S.W.2d 506, 507 (1985) (holding that statutory one year deadline for challenging adoption decree did not bar father, who had no notice of adoption until 18 months after the decree, from suing to set it aside: "We do not discount the importance of the considerations that led to the creation of a short period of limitations in the applicable statute, but on the facts of this appeal the statute must give way to the requirements of due process."); *In re the Adoption of A.W.P.*, Nos. G042254, G042300, 2010 WL 1138279, at *1 (Cal.Ct. App. Mar. 25, 2010) ("Although the Legislature may enact a statute of limitations for challenging an adoption order, a parent who was never given notice of the proceedings has a federal constitutional right to challenge the order even after the limitations period under state law has expired."); *In re C.L.S.*, 252 P.3d 556, 559–60 (Colo.App.2011) (because notice by publication deprived father of due process, the judgment was void, and stat-

utory six-month deadline to challenge judgment was inapplicable); *In re J.M.A.*, 240 P.3d 547, 551 (Colo.App.2010) ("[T]he [90 day limitations period for challenging a termination judgment] should not be interpreted so as to bar a due process challenge to the termination of a parent's rights when, as here, the parent alleges a lack of notice or insufficient notice of the proceedings resulting from the other parent's failure or refusal to identify him as a possible parent."); *In the Matter of D.C.*, 887 N.E.2d 950, 959 (Ind.Ct. App.2008) (holding that Indiana's six-month deadline for challenging adoption proceedings "when applied to bar Biological Mother's challenge to the adoption proceedings in this case, creates an unconstitutional due process violation.... Although this State has a well-recognized interest in providing stability and permanence for children, we are dubious that the General Assembly, in spite of its broad language, intended to permit the termination of constitutionally-protected pa-

### C. Citation by publication deprived L.R. of due process.

■■ With these principles in mind, we examine whether citation by publication was proper in this case. Parental rights are "far more precious than any property right," and when the State initiates a termination proceeding, "it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). We carefully scrutinize termination proceedings, and we strictly construe involuntary termination statutes in the parent's favor. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex.1985); *cf. United States v. Kiriaze*, 172 F.2d 1000, 1002 (5th Cir.1949) ("When, then, the United States, as here, seeks not by actual notice to the citizen but by substituted service by publication to deprive him of

this priceless right [of citizenship], it must strictly comply with the statute authorizing such service.").

■ Personal jurisdiction, a vital component of a valid judgment, is dependent "upon citation issued and served in a manner provided for by law." *Wilson v. Dunn*, 800 S.W.2d 833, 836 (Tex.1990). If service is invalid, it is "of no effect" and cannot establish the trial court's jurisdiction over a party. *Uvalde Country Club v. Martin Linen Supply Co.*, 690 S.W.2d 884, 885 (Tex.1985) (per curiam). When judgment is rendered on service of process by publication, a party has two years to move for a new trial, which the trial court may grant for "good cause." Tex.R. Civ. P. 329(a). But if service was invalid, a party is entitled to a new trial without showing good cause.[22]

rental rights under circumstances providing less notice to the affected party than is required, for example, to obtain a default judgment on a credit card debt"); *In the Interest of S.P.*, 672 N.W.2d 842, 846, 848 (Iowa 2003) (holding that judgment was void because state failed to conduct diligent search before serving by publication, and a void judgment is subject to attack at any time); *Storm v. Mullins*, 199 S.W.3d 156, 162 (Ky. 2006) (holding that if mother was denied due process in adoption proceedings, judgment must be set aside even though she failed to challenge the adoption within the statutory one-year time limit); *In re Adoption of Knipper*, 30 Ohio App.3d 214, 507 N.E.2d 436, 438 (1986): (holding that Ohio statute barring attacks on adoption decrees after one year was "unconstitutional, and therefore ineffective, as applied in this case, because the Ohio Legislature does not constitutionally have the power to deprive the biological mother of her parental rights without valid constructive notice"); *In re Adoption of Welshans*, 150 Or.App. 498, 946 P.2d 1160, 1163 (1997) (noting that one-year deadline statute was unconstitutional as applied because father did not receive notice of adoption); *Hagy v. Pruitt*, 339 S.C. 425, 529 S.E.2d 714, 717 (2000) (holding that one-year limitation for collateral attack on adoption decree did

not bar action to set aside adoption on ground of extrinsic fraud); *Velasco v. Ayala*, 312 S.W.3d 783, 799–800 (Tex.App.—Houston [1st Dist.] 2009, no pet.) (holding that mother deprived of notice that comported with due process could challenge termination order even though it was not filed within Family Code section 161.211's time limit); *In re Adoption of S.L.F.*, 27 P.3d 583, 590 (Utah Ct.App.2001): (holding that due process allowed father to contest adoption even though statute provides otherwise); *F.E. v. G.F.M.*, 35 Va.App. 648, 547 S.E.2d 531, 542 (2001) (holding that application of six-month statute of limitation to father was unconstitutional).

22. *See Caldwell v. Barnes*, 154 S.W.3d 93, 96–97 (Tex.2004) (per curiam)(holding that, on bill of review, "if a plaintiff was not served, constitutional due process relieves the plaintiff from the need to show a meritorious defense"; proof of non-service is all that must be shown); *Hunsinger v. Boyd*, 119 Tex. 182, 26 S.W.2d 905, 907 (1930) (observing that motion for new trial after service by publication was like an equitable bill of review); *Wiebusch v. Wiebusch*, 636 S.W.2d 540, 542 (Tex.App.—San Antonio 1982, no writ) (holding that the court "need not determine 'good cause,' actual knowledge of the suit and a meritorious defense, (Rule 329) because that

The Family Code permits service by publication for individuals who cannot be served personally or through the mail, or if a person's name is unknown. TEX. FAM.CODE § 102.010(a). Citation by publication is served "as in other civil cases," *id.*, and the trial court must "inquire into the sufficiency of the diligence exercised in attempting to ascertain the residence or whereabouts of the defendant ... before granting any judgment on such service." TEX.R. CIV. P. 109; *see also* TEX. FAM.CODE § 161.107(b) ("If a parent of the child has not been personally served in a suit in which the Department of Family and Protective Services seeks termination, the department must make a diligent effort to locate that parent."). A lack of diligence makes service by publication ineffective. *Anderson v. Collum*, 514 S.W.2d 230, 231 (Tex.1974).

We have said that "[i]f personal service can be effected by the exercise of reasonable diligence, substituted service is *not to* be resorted to." *Sgitcovich v. Sgitcovich*, 150 Tex. 398, 241 S.W.2d 142, 147 (1951) (quoting 42 AM. JUR. § 65, p. 54). Yet we have never explained what a diligent search involves. Other courts have. The Illinois Supreme Court recently held that "because service by publication is meant as a last resort of serving summons, it should be used only after a genuine diligent inquiry to locate the individual has been completed. Put simply, relying on a computerized database search of a parent's name while ignoring, or otherwise not investigating, other potentially useful information does not constitute a diligent inquiry" under Illinois law. *In re Dar. C.*, 354 Ill.Dec. 304, 957 N.E.2d 898, 912 (Ill.2011) (holding that service by publication was defective, thus depriving trial court of jurisdiction and rendering its judgment void); *see also id.* at 921–22 (Burke, J., concurring) (not-

ing that when state's attorney is in actual contact with parent several months before default judgment terminating parental rights, previously issued publication notice is insufficient).

The Iowa Supreme Court reached a similar conclusion, where an investigator "failed to exhaust all reasonable means to discover [the father's] whereabouts to ensure that he did receive notice of the termination proceeding." *In the Interest of S.P.*, 672 N.W.2d 842, 848 (Iowa 2003). The father's identity was known, although his address was not. The court held that in determining whether a search is diligent, courts must examine the methods employed to locate the missing person to see if they were made through channels expected to supply the missing identity. *Id.* at 846. Although the court held that a party need not use "all possible or conceivable means of discovery,", a reasonable search "is an inquiry that a reasonable person would make, and it must extend to places where information is likely to be obtained and to persons who, in the ordinary course of events, would be likely to have information of the person or entity sought." *Id.* Thus, although an investigator from the county attorney's office checked with various governmental agencies, private databases, and city directories, and visited addresses where he thought the father might live, he failed to include "the obvious inquiries a reasonable person would make under the circumstances." *Id.* at 848. He did not talk to the children, their caretaker, or their mother. Nor did he mail notice to the various addresses he had to find a forwarding address. Because the efforts fell short of a reasonably diligent search, the father was denied an opportunity to be

test applies only after there has been a valid citation by publication").

heard, and the termination judgment was vacated. *Id.*

The Nebraska Supreme Court reached the same result. *In re Interest of A.W.,* 224 Neb. 764, 401 N.W.2d 477, 478–80 (1987). Thus, where a mother's identity was known, service by publication was not justified even though the mother had said that she was going "underground for a while" because she had written a bad check and the police were looking for her. *Id.* at 479. The department of protective services did not contact her mother, who probably had an address for her. *Id.* Because the search was "less than reasonably diligent," the mother was improperly deprived of an opportunity to be heard. *Id.* at 480. The court vacated the termination order and remanded the case for further proceedings. *Id.*

Similarly, a Georgia appellate court recently concluded that service by publication was improper in a parental rights termination case. *See Taylor v. Padgett,* 300 Ga.App. 314, 684 S.E.2d 434, 438 (2009). Even though the mother said she was living in a truck, the paternal grandparents had her phone number and could communicate with her. *Id.* at 435–37. Additionally, the mother had tried to see the children less than two weeks before the hearing. Finally, her relatives could have been contacted. *Id.* at 437. "Despite the existence of these reasonably available channels of information, the [grandparents] pursued none of them prior to obtaining an order for service by publication upon [the mother].... Accordingly, the record fails to support the juvenile court's determination that service by publication was proper." *Id.*

 We agree with the principles stated in these cases. A diligent search must

include inquiries that someone who really wants to find the defendant would make,[23] and diligence is measured not by the quantity of the search but by its quality. Even disregarding the factual dispute about what L.R. told Chidozie about her address, the uncontroverted evidence here establishes a lack of diligence. Chidozie neglected "obvious inquiries" a prudent investigator would have made. *In the Interest of S.P.,* 672 N.W.2d at 848. She did not contact L.R.'s mother, nor she did attempt service by mail in an effort to obtain a forwarding address. She did not pursue other forms of substituted service that would have been more likely to reach L.R., such as leaving a copy with L.R.'s mother. *See* Tex.R. Civ. P. 106(b)(1); *see also McDonald v. Mabee,* 243 U.S. 90, 92, 37 S.Ct. 343, 61 L.Ed. 608 (1917) ("To dispense with personal service the substitute that is most likely to reach the defendant is the least that ought to be required if substantial justice is to be done."). Even if L.R.'s address was not "reasonably ascertainable," an address was unnecessary for personal service on L.R. because she visited the Department's offices during the relevant time period. When a known parent has not left the jurisdiction, when she has attended at least two court hearings and has come to the Department offices for a prescheduled, hour-long meeting with her children during the very period service was being attempted, and when the Department can reach her by telephone and can communicate with her family members, service by publication cannot provide the kind of process she is due. Sending a few faxes, checking websites, and making three phone calls—none of which were to L.R. or her family members—is not the type of diligent inquiry required before the Department may dis-

---

**23.** *Cf. Mullane,* 339 U.S. at 315, 70 S.Ct. 652 ("The means employed must be such as one

desirous of actually informing the absentee might reasonably adopt to accomplish it.").

pense with actual service in a case like this. *Mullane* authorized service by publication when "it is not reasonably possible or practicable to give more adequate warning." *Mullane*, 339 U.S. at 317, 70 S.Ct. 652.[24] Here, it was both possible and practicable to more adequately warn L.R. of the impending termination of her parental rights, and notice by publication was therefore constitutionally inadequate. *Jones v. Flowers*, 547 U.S. 220, 237, 126 S.Ct. 1708, 164 L.Ed.2d 415 (2006).

**D. Because service was invalid, Family Code section 161.211 does not bar L.R.'s claim.**

■ We must next decide the effect of the failure to provide adequate notice. Family Code section 161.211 provides that "the validity of an order terminating the parental rights of a person who is served by citation by publication is not subject to collateral or direct attack after the sixth month after the date the order was signed." TEX. FAM.CODE § 161.211(b). L.R. contends—as did the dissent below—that this bar applies only to parents for whom service by publication is valid. Failing that, L.R. argues that the statute is unconstitutional as applied to her.[25]

■ Whether we conclude that the statute applies only if service was valid or that the statute is unconstitutional as applied to L.R., the reasoning and result are the same in this case. A complete failure of service deprives a litigant of due process and a trial court of personal jurisdiction; the resulting judgment is void and may be challenged at any time. *See Tulsa Prof'l,* 485 U.S. at 491, 108 S.Ct. 1340 (holding that due process violation made judgment vulnerable to attack even though challenge filed beyond statutory two-month deadline); *Peralta v. Heights Med. Ctr. Inc.,* 485 U.S. 80, 86, 108 S.Ct. 896, 99 L.Ed.2d 75 (1988) (concluding that Texas bill-of-review requirements must yield to constitutional demands of due process); *Browning v. Prostok,* 165 S.W.3d 336, 346 (Tex. 2005) (recognizing that judgment void for lack of personal jurisdiction could be collaterally attacked); *see also supra* note 21. *McEwen v. Harrison,* 162 Tex. 125, 345 S.W.2d 706, 711 (1961), has conflicting language, but its pronouncement on that subject must yield to contrary precedent from the U.S. Supreme Court. Accordingly, the statute cannot place a temporal limit on a challenge to a void judgment filed by a defendant who did not receive the type of notice to which she was constitutionally entitled.[26] Despite the Legislature's intent to expedite termination proceedings, it cannot do so at the expense of a parent's constitutional right to notice. *Cf. In the Interest of M.N.,* 262 S.W.3d 799, 803 (Tex. 2008) (noting that Family Code did not indicate legislative intent to unfairly or

---

**24.** *Cf. Sgitcovich v. Sgitcovich,* 150 Tex. 398, 241 S.W.2d 142, 147 (1951) (concluding that "[s]tatutes which assume to authorize service of process by publication on resident defendants when personal service is practicable are unconstitutional and void").

**25.** L.R. asserts claims under both the Due Process Clause of the United States Constitution and article I, section 19 of the Texas Constitution. Because "[t]he parties have not identified any difference between the state and federal guarantees material to the issues in this case," we treat them as the same.

*Nat'l Collegiate Athletic Ass'n v. Yeo,* 171 S.W.3d 863, 867–68 (Tex.2005).

**26.** The Department argues that L.R. waived her constitutional challenge. We disagree. When the court of appeals decides the case on an issue not presented to the trial court (and one raised by an adverse party only after appellate briefing had been concluded), a complaint arising from the court of appeals' judgment may be raised for the first time in a petition for review. *See Bunton v. Bentley,* 153 S.W.3d 50, 53 (Tex.2004) (per curiam).

unreasonably preclude parents from appealing final orders).

██ We appreciate the policy concerns the Department identifies. It, the parent, and the child share an interest in a quick and final decision. *In the Interest of M.S.*, 115 S.W.3d 534, 548 (Tex.2003). But finality cannot trump a parent's constitutional right to be heard. *Stanley v. Illinois*, 405 U.S. 645, 646, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (noting that "the Constitution recognizes higher values than speed and efficiency"). We have twice held that Family Code provisions that expedite termination proceedings must yield to due process. *See In the Interest of B.G.*, 317 S.W.3d 250, 258 (Tex.2010) (holding that failure to file requisite statement of appellate points could not, consistent with due process, form a basis for denying parent an appellate record and that Family Code section 263.405 was unconstitutional as applied to parent); *In the Interest of J.O.A.*, 283 S.W.3d 336, 339, 347 (Tex.2009) (holding that despite parents' failure to file timely statement of appellate points, due process required that they be allowed to appeal complaining of ineffective assistance of counsel; "section 263.405(i) is unconstitutional as applied when it precludes a parent from raising a meritorious complaint about the insufficiency of the evidence supporting the termination order"). We reach the same conclusion here: the statute's time limits cannot foreclose an attack by a parent who was deprived of constitutionally adequate notice.[27]

## III. A parent who learns that her rights have been terminated cannot unreasonably delay in seeking to have them reinstated, if vacating the judgment would impair another party's substantial interest in reliance on that judgment.

██ While actual notice of ongoing proceedings cannot substitute for proper service,[28] a parent's right to challenge a termination judgment must have bounds. Under the Restatement, a party may not challenge an invalid default judgment if, (1) after receiving actual notice of the judgment, she manifested an intention to treat the judgment as valid; and (2) granting relief would impair another person's substantial interest of reliance on the judgment. 2 RESTATEMENT (SECOND) OF JUDGMENTS, § 66. As one comment explains:

The right to avoid a judgment subject to the infirmities referred to in this Section [including inadequate notice] is not lost by reason of delay on the part of the moving party. In traditional theory this was attributed to the proposition that a "void" judgment is necessarily void *ab initio* and hence can never have the effect of securing rights. It appears more accurate to say that lapse of time

**27.** In light of this holding, we need not reach L.R.'s argument that section 161.211's deadline, though mandatory, is an affirmative defense that may not be raised for the first time on appeal, as several courts of appeals have held. *See In re Bullock*, 146 S.W.3d 783, 790–91 (Tex.App.—Beaumont 2004, no pet.) ("[S]ection 161.211's six month limitation on attacks on termination rulings is an affirmative defense, which is a proposition a defendant may interpose to defeat a plaintiff's prima facie case."); *In re S.A.B.*, No. 04–01–00795–CV, 2002 WL 31060158, at * 1 (Tex. App.—San Antonio Sept. 18, 2002, pet. de-

nied) (holding that appellant waived the affirmative defense of limitations in section 161.211); *see also In re M.Y.W.*, No. 14–06–00185–CV, 2006 WL 3360482, at *3 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) (concluding that six-month limitations period was an affirmative defense). *But see* 335 S.W.3d 816, 821. Waived or not, the deadline is inapplicable because service by publication failed to comport with due process.

**28.** *Wilson v. Dunn*, 800 S.W.2d 833, 836–37 (Tex.1990).

alone does not create reliance interests in a judgment, for when lapse of time is accompanied by change of circumstance there may be grounds for refusing to treat the judgment as a nullity. See § 66. Related to this is the fact that when the judgment is for money, it may not affect the parties' future conduct—and hence create interests of reliance on the judgment—until an attempt is made to execute on the judgment. Many of the cases asserting that delay does not affect the right to attack a void judgment involve attacks made in resistance to execution of money judgments. *In contrast, when a judgment has prominent future effects, such as a judgment determining marital or filial status, reliance interests are very likely to arise.* *Id.* § 65 cmt. c (emphasis added). Few judgments have more substantial future ramifications than those affecting parentage.

And even though the Supreme Court has never addressed the precise question before us, it has consistently highlighted the defendant's prompt action upon learning of an adverse judgment, even when service by publication violated the defendant's due process rights. *See, e.g., Mennonite,* 462 U.S. at 794–95, 103 S.Ct. 2706 (noting that Mennonite "did not realize that the property had been sold" and "first learned of the tax sale" just three months before suing to set it aside); *Schroeder,* 371 U.S. at 210–11, 83 S.Ct. 279 (stating that claimant alleged that "she had never been notified of the condemnation proceedings, and knew nothing about them, nor of her right to make a claim against the city for damages to her property" until a few months before she filed suit); *Walker,* 352 U.S. at 114, 77 S.Ct. 200 (observing that

petition alleged that landowner "had never been notified of the condemnation proceedings and knew nothing about them until after the time for appeal had passed"); *see also Greene,* 456 U.S. at 446–47, 102 S.Ct. 1874 (noting that, despite notice by posting, defendants did not learn of eviction proceedings until "after default judgments had been entered against them, and after their opportunity for appeal had lapsed"); *Armstrong v. Manzo,* 380 U.S. 545, 548, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965) (noting that natural father "promptly filed a motion . . . asking that the adoption decree be 'set aside'" once he learned that his child had been adopted).

The Supreme Court has also suggested that reliance interests in a parental rights case may be relevant even when the defendant's due process rights were clearly breached. *See Rothstein v. Lutheran Social Servs.,* 405 U.S. 1051, 92 S.Ct. 1488, 31 L.Ed.2d 786 (1972). After deciding in *Stanley v. Illinois*[29] that an unwed father was entitled to a hearing before his parental rights were terminated, the Court vacated a Wisconsin Supreme Court decision to the contrary. *Id.* at 1051, 92 S.Ct. 1208. The Court remanded to the Wisconsin courts for reconsideration of the father's rights in light of *Stanley,* with instructions to provide "due consideration for the completion of the adoption proceedings and the fact that the child has apparently lived with the adoptive family for the intervening period of time." *Id.*

Although courts have variously referred to a parent's inaction as waiver, estoppel, or laches, the theories merge: when a child's welfare hangs in the balance, the reliance interest created by a termination order need not yield when a parent learns of the order yet unreasonably fails to act.[30]

---

**29.** 405 U.S. 645, 657–58, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972).

**30.** *See, e.g., In re Adoption of A.W.P.,* Nos. G042254, G042300, 2010 WL 1138279 (Cal. Ct.App. Mar. 25, 2010) (observing that "our

Unlike a judgment debtor who hopes to avoid collection efforts on a money judgment, a parent whose rights have been terminated has every incentive to promptly seek reinstatement upon learning of the termination. "[A] failure to protest the judgment in such a situation can be taken as an affirmation of the judgment because the circumstances invite[ ] an expression of a contrary position." 2 RESTATEMENT (SECOND) OF JUDGMENTS, § 66 cmt. b. Thus, while we have held that a judgment debtor's post-judgment diligence may be irrelevant in cases involving a default judgment for money damages,[31] we cannot reach the same conclusion here.[32]

██ If, after learning that a judgment has terminated her rights, a parent unrea-

sonably stands mute, and granting relief from the judgment would impair another party's substantial reliance interest, the trial court has discretion to deny relief. Here, although L.R. learned that her rights were terminated, she provided no information about when she learned of the termination order or what actions she took in response. The record is notably silent on the point. On remand, the trial court should explore this issue.[33]

## IV. Conclusion

██ The Department's allegations against L.R. are serious, and if proven, may justify terminating her parental rights. But that determination cannot be made before she is given notice and the

sister states have uniformly held that the only limitation on a parent who seeks to challenge an adoption on the ground of lack of notice is reasonableness in bringing the claim once the parent has knowledge of the order"); *In re Adoption of Miller*, Nos. 8–02–22, 8–02–23, at *3–4 (Ohio Ct.App. Feb. 19, 2003) (holding that mother who was notified of adoption but failed to take action for sixteen months was barred by one year statute of limitations; " 'A rule that an individual's right to set aside a judgment entered without jurisdiction over him cannot be cut off by lapse of time ... does not and should not apply to the case where interests exist superior to those of the party whose rights are terminated.' ") (quoting *In re Adoption of Moore*, No. 88 AP–746, 1989 WL 92063, 1989 Ohio App. LEXIS 3156 (Ohio Ct.App. Aug. 15, 1989)); *Hagy v. Pruitt*, 339 S.C. 425, 529 S.E.2d 714, 717 n. 7 (2000) (holding that one year limitation for collateral attack on adoption decree does not bar action to set aside adoption on ground of extrinsic fraud, although doctrine of laches will apply in determining whether such action is barred); *In re Adoption of S.L.F.*, 27 P.3d 583, 589 n. 4 (Utah Ct.App.2001) (holding that due process allowed father to contest adoption even though statute said he could not, but his claim would be subject to laches if he "unreasonably delayed in bringing an action" and the respondent was "prejudiced by that delay") (internal quotation marks omitted); *see also F.E. v. G.F.M.*, 35 Va.App. 648, 547

S.E.2d 531, 541 (2001) (assuming that father had duty to act diligently to preserve his rights, but concluding there was no evidence that indicated that he failed to do so); 2 RESTATEMENT (SECOND) OF JUDGMENTS § 66 cmt. a (1982)(observing that courts have used various explanations, including equity or estoppel, to justify the "apparent anomaly of ... according a 'void' judgment the dispositive effect of a valid judgment" but concluding that decisions could instead be reconciled as reflecting party's assent to judgment).

**31.** *See Ross v. Nat'l Ctr. for the Emp't of the Disabled*, 197 S.W.3d 795, 798 (Tex.2006) (per curiam); *see also Caldwell v. Barnes*, 975 S.W.2d 535, 538–39 (Tex.1998) (noting that "[l]aches should not bar an action on which limitations has not run unless allowing the action 'would work a grave injustice' " (quoting *Culver v. Pickens*, 142 Tex. 87, 176 S.W.2d 167, 170 (1943))).

**32.** *Cf. Shah v. Moss*, 67 S.W.3d 836, 847 (Tex.2001) (holding that "[a] plaintiff may not obtain relief under the open courts provision if he does not use due diligence and sue within a reasonable time after learning about the alleged wrong.").

**33.** On remand, L.R. need not be served with citation, as she is presumed to have now entered an appearance. *See* TEX R. CIV. P. 123.

opportunity to be heard. Service by publication deprived L.R. of due process. She is entitled to a new trial unless she unreasonably delayed in seeking relief after learning of the judgment against her, and granting relief would impair another party's substantial reliance on the judgment. We reverse the court of appeals' judgment and remand to the trial court for further proceedings consistent with this opinion. TEX.R.APP. P. 60.2(d).

Justice LEHRMANN, concurring.

Justice LEHRMANN, concurring.

On rehearing, the State contends that the Court's decision that service by publication in this case failed to comport with due process is faulty because L.R. had appeared at several hearings. Normally, if a defendant appears in open court, the appearance has "the same force and effect as if the citation had been duly issued and served as provided by law." TEX.R. CIV. P. 120. In this instance, though, L.R. never appeared in court after the State's petition to terminate her parental rights had been filed. *See* TEX. FAM.CODE § 102.009(a)(7). Accordingly, I concur with the Court's order denying the State's motion for rehearing.